**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| **FOND DU LAC BAND OF LAKE SUPERIOR CHIPPEWA,** | **Case No.** 0:21-cv-1714 |
| **Plaintiff,** | **COMPLAINT** |
| **vs.** | **JURY TRIAL DEMANDED** |
| **MCKINSEY & COMPANY, INC.,** | |
| **Defendant.** | |

## TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ............................................................................. 1
II.     JURISDICTION AND VENUE ...................................................... 2
III.    PARTIES ......................................................................................... 3
        A.      Plaintiff .............................................................................. 3
        B.      Defendant ........................................................................... 5
IV.     FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS.......... 5
        A.      The Corporate Integrity Agreement.................................... 5
        B.      McKinsey's Role Following the Corporate Integrity Agreement ........................ 6
                1.      The Sacklers seek to divert money to themselves. ................................... 6
                2.      McKinsey supplied Purdue with Granular Sales and Marketing
                        Strategies and Remained Intimately Involved in Implementation............ 7
        C.      Project Turbocharge........................................................... 8
        D.      McKinsey knew about dangers of opioids and acted to maximize
                OxyContin prescriptions anyway ..................................... 10
        E.      Purdue's 2020 Guilty Plea and McKinsey's Recent Statement ........................... 11
        F.      Impact of Opioid Abuse, Addiction and Diversion on American Indians
                and Alaska Natives ........................................................... 12
        G.      The Impact of McKinsey's Work with Opioid Manufacturers on Plaintiff......... 15
        H.      Tolling of Statutes of Limitations .................................... 17
                1.      Equitable Estoppel and Fraudulent Concealment.................................... 17
                2.      McKinsey and Purdue Persisted in The Fraudulent Scheme Despite
                        a Guilty Plea and Large Fine ......................................... 18
V.      FACTUAL ALLEGATIONS PERTAINING TO CLAIMS UNDER THE
        RACKETEER-INFLUENCED AND CORRUPT ORGANIZATIONS (RICO)
        ACT: THE OPIOID MARKETING ENTERPRISE ......................................... 19
        A.      The Common Purpose and Scheme of the Opioid Marketing Enterprise........... 19
        B.      The Conduct of the Opioid Marketing Enterprise Violated Civil RICO ........... 22
        C.      Pattern of Racketeering Activity........................................ 23
VI.     CAUSES OF ACTION ................................................................ 27
        A.      Count I: Racketeer Influenced and Corrupt Organizations (RICO),
                18 U.S.C §1961, *et seq.* ................................................. 27
        B.      Count II: Public Nuisance Pursuant to Minn. Stat. § 609.74 ........................... 34
        C.      Count III: Negligence and Negligence Per Se ................................... 39
        D.      Count IV: Civil Conspiracy ............................................. 41
        E.      Count V: Unjust Enrichment ........................................... 43
        F.      Count VI: Violation of Minn. Stat. § 325F.68 – Prevention of Consumer
                Fraud ................................................................................ 44
        G.      Count VII: Violation of Minn. Stat. § 325D.09 *et seq.* – Unlawful Trade
                Practices .......................................................................... 46
        H.       Count VIII: Violation of Minn. Stat. § 325D.43 *et seq.* – Deceptive Trade
                Practices .......................................................................... 47
VII.    PRAYER FOR RELIEF ............................................................... 49
        REQUEST FOR JURY TRIAL ................................................ 50

## I.    <u>INTRODUCTION</u>

1.      This case arises from the worst man-made epidemic in modern medical history—the misuse, abuse, and over-prescription of opioids. This crisis arose from the opioid manufacturers' deliberately deceptive marketing strategy to expand opioid use.

2.      McKinsey and Company, Inc. ("McKinsey" or "Defendant") played an integral role in creating and deepening the opioid crisis.

3.      In the years following Purdue Pharma L.P.'s ("Purdue") 2007 guilty plea for misleadingly marketing OxyContin, McKinsey worked closely with Purdue to dramatically increase OxyContin sales to the benefit of McKinsey, Purdue, and the Sackler family, the wealthy family that has owned and controlled Purdue for decades. McKinsey specifically sought to maximize OxyContin sales by working around the requirements of the Corporate Integrity Agreement that Purdue entered as part of its guilty plea. McKinsey also performed related work for other manufacturers of opioids, including Johnson & Johnson. Through the conduct described in this complaint, McKinsey participated in and helped orchestrate a broad scheme to deceptively market opioids.

4.      McKinsey knew of the dangers of opioids and of Purdue's prior misconduct, but nonetheless advised Purdue to improperly market and sell OxyContin, supplying granular sales and marketing strategies and remaining intimately involved throughout implementation of those strategies. McKinsey's actions resulted in a surge in sales of OxyContin and other opioids that fueled and prolonged the opioid crisis.

5.      In a series of agreements, McKinsey has recently settled opioid-related claims with 49 states, the District of Columbia, and five U.S. territories.

- 1 -

6.      Plaintiff Fond du Lac Band of Lake Superior Chippewa ("Plaintiff" or the "Band") is a sovereign Indian tribe responsible for the health and well-being of its citizens. Native Americans have disproportionately borne the toll of the opioid crisis. Plaintiff brings suit to hold McKinsey responsible for its role in that crisis, which has posed an existential threat to tribes and tribal communities.

## II.   JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over this action because the Plaintiff brings a federal cause of action that raises a federal question pursuant to 28 U.S.C. § 1331, and because this action is brought by an Indian tribe pursuant to 28 U.S.C. § 1362. The Court also has supplemental jurisdiction over the Plaintiff's state law claims pursuant to 28 U.S.C. § 1367 because the state law claims are part of the same case or controversy.

8.      This Court has personal jurisdiction over Defendant because at all relevant times, McKinsey has purposely availed itself of the privilege of doing business in the State of Minnesota, including by engaging in the business of researching, designing, and implementing marketing and promoting strategies for various opioid manufacturers, including Purdue, in support of their sales and marketing of opioids in Minnesota

9.      Venue is proper in the United States District Court for the District of Minnesota under 28 U.S.C. § 1391(g) and 18 U.S.C. § 1965. Plaintiff hereby asserts that, because a substantial part of the events or omissions giving rise to this action occurred in Minnesota and because the Defendant is subject to the jurisdiction of the United States District Court for the District of Minnesota, venue is thereby proper.

III.   **PARTIES**

A.   **Plaintiff**

10.   Plaintiff, Fond du Lac Band of Lake Superior Chippewa ("Plaintiff" or the "Band"), is a sovereign Indian Tribe that retains its aboriginal rights of self-governance and self-determination, pursuant to the Treaty of LaPointe of September 30, 1854, the Indian Reorganization Act of 1934, the common law of the United States, and as recognized by the United Nations Declaration on the Rights of Indigenous Peoples of September 17, 2007. The Band currently occupies the Fond du Lac Reservation in Northern Minnesota, in Carlton and St. Louis Counties. Ancestors of the Band, the Ojibwe, have resided in the geographic area since approximately 800 A.D. The Fond du Lac Band exercises inherent governmental authority within the Fond du Lac Reservation and on behalf of the health and welfare of the Fond du Lac Band and its members, children, and grandchildren. Members of the Fond du Lac Band affected by the actions and conduct of the Defendants alleged herein primarily live on the Fond du Lac Reservation.  The Band exercises inherent sovereign governmental authority within the Band's Indian Lands and on behalf of the health and welfare of the Band and its members ("Band Members"), their descendants, children, and grandchildren.

11.   A substantial number of Fond du Lac Band Members have fallen victim to the opioid epidemic, becoming addicted to prescription opioids or coping with family members who are addicted. As a result, there has been a substantial increase in the caseload of counselors working in the Band's Youth and Family Services department.  The Band's foster care program has also been strained by the opioids epidemic.  The Band has seen an increase in babies born addicted to opioids due to their mother's consumption of opioids during pregnancy.  Many have to be placed in foster care further to the economic and resources on the Band's program.

12.     The Band has incurred significant costs in an attempt to abate the opioid epidemic that continues to plague its members and Indian Lands, providing medical services and opioid-related treatments to those in need. The Band has incurred extraordinary costs, damages, and financial impact to every department of its Band Government: housing, education, security, services, medical, labor, operations, waste treatment, foster care, after school care, etc.  The Band brings this suit, in part, to recover these costs and procure the additional financial resources required to adequately combat and abate opioid addiction, opioid-related injuries, and other problems caused by the opioid crisis.

13.     This action is brought by the Band in the exercise of its authority as a sovereign government and on behalf of the Band in its proprietary capacity and under its *parens patriae* authority in the public interest to protect the health, safety, and welfare of all Fond du Lac Band Members to stop the growing prescription opioid epidemic within the Band.  The Band also brings this action as to recover damages and seek other redress for harm caused by Defendants' improper, wrongful, fraudulent, and tortious conduct with respect to the distribution and sale of prescription opioids.  Defendants' actions have caused, and continue to cause, a crisis that threatens the health, safety, and welfare of the Band.

14.     Nothing herein shall be deemed a waiver of the Band's sovereign immunity.

15.     The opioid crisis is straining the Band's ability to provide adequate services to its members.  With its limited resources, the Band has been forced to divert funds from other tribal priorities to staff new positions needed to address the opioid crisis, including substance abuse counselors, nurses, and physicians specializing in addiction.

**B.**     **Defendant**

16.     Defendant McKinsey and Company, Inc. is a corporation organized under the laws of the state of New York. McKinsey's principal place of business is located at 711 Third Avenue, New York, NY 10017.

17.     McKinsey is a worldwide management consultant company. From approximately 2004-2019, McKinsey provided consulting services to Purdue Pharma L.P., working to maximize sales of OxyContin and knowingly perpetuating the opioid crisis. McKinsey has provided related consulting services to other manufacturers of opioids.

**IV.**     **FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS**

**A.**     **The Corporate Integrity Agreement**

18.     In May of 2007, Purdue Frederick Company, the parent company of Purdue Pharma L.P. ("Purdue") pleaded guilty to charges for misleading regulators, doctors, and the public regarding Purdue's opioid OxyContin. In pleading guilty, Purdue admitted to falsely marketing OxyContin as a less addictive, safer alternative to other pain medications.

19.     In the global settlement resolution, Purdue and its parent company paid over $600 million and entered into a Corporate Integrity Agreement with the U.S. Department of Health and Human Services Office of Inspector General.

20.     Under the Corporate Integrity Agreement, for five years, Purdue was required to refrain from making any deceptive or misleading claims about OxyContin and was obligated to submit regular compliance reports regarding its sales and marketing practices. Purdue was also required to monitor, report, and attempt to prevent inappropriate prescribing practices.

### B.      McKinsey's Role Following the Corporate Integrity Agreement

#### 1.      The Sacklers seek to divert money to themselves.

21.      The Sackler family is among the richest families in the United States. Members of the Sackler family have controlled Purdue at all times relevant to this complaint.

22.      Following the guilty plea, the Sacklers sought to insulate themselves from the risk they perceived in Purdue. Email threads between the Sacklers in early 2008 indicate that the Sacklers had become concerned about personal liability regarding opioid-related misconduct.

23.      The Sacklers considered selling Purdue or merging with another pharmaceutical company as an option for limiting their risk. Mortimer Sackler Jr. advocated for a sale or merger in a February 21, 2008 email to Dr. Richard Sackler (a former president and co-chairman of Purdue) and several others, writing "[t]he pharmaceutical industry has become far too volatile and risky for a family to hold 95% of its wealth in. It simply is not prudent for us to stay in the business given the future risks we are sure to face and the impact they will have on the shareholder value of the business and hence the family's wealth." The risk he referred to was, at least in significant part, further liability related to misconduct in the marketing and sale of OxyContin.

24.      Alternatively, the Sacklers considered extracting as much wealth as possible from Purdue through distributions to themselves as shareholders. Such distributions would allow the Sacklers to diversify their assets and make their wealth less vulnerable to judgments regarding Purdue's sales and marketing of opioids, including OxyContin.

25.      Either option -- a sale or significant distributions to shareholders -- would require Purdue to increase profitability in the short term. Purdue turned to McKinsey, with which it had an existing business relationship, for help maximizing sales of OxyContin given the requirements of the Corporate Integrity Agreement and the scrutiny that came along with it.

###### 2. McKinsey supplied Purdue with Granular Sales and Marketing Strategies and Remained Intimately Involved in Implementation

26.    McKinsey touts its model of engaging in transformational partnerships with its clients. Rather than giving one-off advice, McKinsey learns each client's business intimately and provides tailored, granular strategies.

27.    McKinsey had begun collaborating with Purdue by June 2009.  McKinsey was tasked with increasing OxyContin sales despite the Corporate Integrity Agreement, which required, among other things, that Purdue comport with FDA requirements and also included increased review and reporting obligations.

28.    McKinsey provided sales and marketing strategies designed to sell as much OxyContin as possible, at one point in 2010 telling Purdue that the new strategies McKinsey had developed could generate as much as $400,000,000 in additional annual sales. McKinsey worked with Purdue to implement the strategies, with McKinsey's ongoing and extensive involvement.

29.    OxyContin sales grew dramatically, and the Sacklers diverted the resulting profits into other holdings.

30.    In a 2009 report, among other sales strategies, McKinsey advised Purdue sales representatives to push the highest dosages of OxyContin, which were the most profitable for Purdue. In order to maximize dosages and improve targeting of the coordinated marketing strategy, McKinsey investigated the prescribing habits of individual physicians.

31.    McKinsey helped shape Purdue's OxyContin marketing, which misleadingly centered on freedom and peace of mind for users. The marketing was tailored to avoid running directly afoul of the Corporate Integrity Agreement, but it remained misleading given what Purdue and McKinsey knew about opioids. One advertisement said, "we sell hope in a bottle," despite the fact that both McKinsey and Purdue already understood the addiction problems associated with

opioid use and abuse.  McKinsey encouraged Purdue to tell doctors that OxyContin would give their patients "the best possible chance to live a full and active life."

32.     McKinsey urged Purdue to train and incentivize its sales representatives to increase sales across the market for opioids, even if sales went to Purdue's competitors. This was intended to serve the Sackler family's goal of increasing the marketability of Purdue for potential mergers, but it had the effect of worsening the opioid crisis even beyond the portion of the crisis directly attributable to sales and use of OxyContin.

**C.     Project Turbocharge**

33.     The Corporate Integrity Agreement expired in 2012.  With this restriction lifted, McKinsey devised additional marketing and sales strategies for Purdue to further increase OxyContin sales.

34.     In the second half of 2013, McKinsey made recommendations to Purdue to increase OxyContin revenue, including "Turbocharging Purdue's Sales Engine."

35.     McKinsey's "Project Turbocharge" recommendations included revising the existing process for targeting high-prescribing physicians, with a shift from targeting solely on the basis of prescription deciles to considering additional factors. Based on its analysis, McKinsey told Purdue that "[t]here is significant opportunity to slow the decline of OxyContin by calling on more high-value physicians" and that "[t]he revenue upside from sales re-targeting and adherence could be up to $250 million."

36.     Also as part of the "Project Turbocharge" recommendations, McKinsey determined and advised Purdue that the top half of prescribing physicians "write on average 25 times more scripts per prescriber" than the lower half.

37.     Despite knowing that then-recently-expired Corporate Integrity Agreement required Purdue to refrain from improperly incentivizing OxyContin sales, McKinsey also recommended increasing incentive compensation for incremental OxyContin prescriptions, advising Purdue that "[r]evision to incentive comp could better align reps to Purdue's economics."

38.     At the same time, McKinsey recommended decreasing training by six days a year in order to allow employees more time to make sales calls. Meanwhile, McKinsey advised Purdue to exercise closer control over its sales staff in order to generate more efficient physician targeting.

39.     Physician targeting proved effective. McKinsey advised Purdue that visiting high-prescribing doctors many times per year increased sales.

40.     McKinsey recommended that Purdue circumvent pharmacies entirely with a mail order program because enforcement by federal regulators was decreasing OxyContin dispensing through Walgreens.

41.     At the board level, McKinsey urged the Sacklers to impose a "revenue growth goal" on management.

42.     With McKinsey's ongoing involvement and advice, Purdue implemented McKinsey's recommendations discussed above, but rebranded the program from Project Turbocharge to Evolve to Excellence.

43.     McKinsey's efforts had the effect the Sacklers had asked McKinsey to achieve. Sales of OxyContin tripled in the years following the 2007 guilty plea, despite the restrictions imposed by the Corporate Integrity Agreement. According to the U.S. Department of Justice, "[f]rom 2010 to 2018, Purdue's profits were almost entirely driven by its success in selling OxyContin."

44.     The Sacklers did not sell Purdue or enter into a merger, but their goal of extracting wealth from the business was realized. The Sackler family has withdrawn over $10 billion from Purdue since 2008, including $1.7 billion in 2009 alone. These distributions were made possible by McKinsey's services and came at the expense of a deepening national opioid crisis.

**D.     McKinsey knew about dangers of opioids and acted to maximize OxyContin prescriptions anyway**

45.     McKinsey has a long history of consulting in the pharmaceutical industry. In addition to its work with Purdue, McKinsey has performed "opioid-related work" for Johnson & Johnson, Endo International, and Mallinckrodt Pharmaceuticals. For instance, a McKinsey PowerPoint presentation prepared for Johnson & Johnson recommended that Johnson & Johnson aggressively target and influence doctors treating back pain in order to increase opioid sales.

46.     Purdue's 2007 guilty plea put McKinsey on notice of Purdue's misconduct. By that time, McKinsey had access to public information indicating that OxyContin and other opioids pose significant risk of addiction and misuse.

47.     McKinsey's presentations to Purdue in 2013 included extensive discussion of doctors' concerns about opioid misuse and side effects, demonstrating McKinsey's awareness of the dangers of opioids. Rather than working to limit these disastrous effects, McKinsey treated doctors' misgivings as obstacles to confront with new messaging.

48.     McKinsey continued working with Purdue long after the severity of the opioid crisis was well known. In 2017, McKinsey proposed that Purdue pay CVS and other distributors of OxyContin rebates "for every OxyContin overdose attributable to pills they sold."

49.     A former McKinsey consultant described McKinsey's work with Purdue as "the banality of evil, M.B.A. edition...They knew what was going on. And they found a way to look

past it, through it, around it, so as to answer the only questions they cared about: how to make the client money, and when the walls closed in, how to protect themselves."

50.     In a 2018 email thread, apparently fearing consequences for McKinsey's work with Purdue, two McKinsey senior partners who had participated in McKinsey's work advising Purdue discussed deleting documents related to opioids.

**E.     Purdue's 2020 Guilty Plea and McKinsey's Recent Statement**

51.     In October of 2020, Purdue once again reached an agreement (the "2020 Settlement Agreement") with the U.S. Department of Justice to enter a guilty plea related to its marketing of OxyContin. The agreement includes $8.3 billion in penalties from Purdue and $225 million from the Sackler family.

52.     In the 2020 Settlement Agreement, Purdue pleaded guilty to defrauding health agencies, violating anti-kickback laws, paying illegal kickbacks to doctors, and "using aggressive marketing tactics to convince doctors to unnecessarily prescribe opioids--frivolous prescriptions that experts say helped fuel a drug addiction crisis that has ravaged America for decades."

53.     The 2020 Settlement Agreement was entered by Purdue and the United States government. It explicitly states that it does not release Purdue of "[a]ny liability for claims of the states or Indian tribes."

54.     The 2020 Settlement Agreement includes a provision specifically reserving claims regarding "[a]ny liability of entities other than the [Purdue Bankruptcy] Debtors, including consultants."

55.     On December 5, 2020, McKinsey issued the following statement regarding its work with Purdue:

> *December 5, 2020*—As we look back at our client service during the opioid crisis, we recognize that we did not adequately acknowledge the epidemic

unfolding in our communities or the terrible impact of opioid misuse and addiction on millions of families across the country. That is why last year we stopped doing any work on opioid-specific business, anywhere in the world.

Our work with Purdue was designed to support the legal prescription and use of opioids for patients with legitimate medical needs, and any suggestion that our work sought to increase overdoses or misuse and worsen a public health crisis is wrong. That said, we recognize that we have a responsibility to take into account the broader context and implications of the work that we do. Our work for Purdue fell short of that standard.

We have been undertaking a full review of the work in question, including into the 2018 email exchange which referenced potential deletion of documents. We continue to cooperate fully with the authorities investigating these matters.

56.     In recent weeks, McKinsey has settled opioid-related claims with 49 states, the District of Columbia, and five U.S. territories.

**F.     Impact of Opioid Abuse, Addiction and Diversion on American Indians and Alaska Natives**

57.     There are 574 federally recognized Tribes in the United States, located within the borders of 35 states. They are diverse in terms of their size, geography, culture, and resources, but they share a status as sovereign governments responsible for the health and well-being of their citizens.

58.     Native Americans have disproportionately borne the toll of the opioid crisis.

59.     Native Americans suffer the highest per capita rate of opioid overdoses.

60.     According to the Indian Health Service ("IHS"), there has been a "four-fold increase in opioid overdoses from 1999 to 2013 among American Indians and Alaska Natives . . . [T]wice the rate of the general U.S. population."

61.     The CDC reported that the "rates of death from prescription opioid overdose among American Indian or Alaska Natives increased almost four-fold from 1.3 per 100,000 in 1999 to 5.1

per 100,000 in 2013." By 2014, the CDC reported "8.4 per 100,000 Native Americans were dying of opioid overdoses, the highest number of any racial demographic."

62.     In 2014, Native Americans had the highest death rate from opioid overdoses out of any ethnic group in the country.

63.     The impact on Native American children is particularly devastating. In a study conducted to examine substance-related disorders among adolescents across racial and ethnic groups, "Racial/Ethnic Variations in Substance-Related Disorders Among Adolescents in the United States," the authors found, of 72,561 adolescents aged 12 to 17 years:

    a.    Analgesic opioids were the second most commonly used illegal drug after marijuana;

    b.    Analgesic opioid use was comparatively prevalent among Native American adolescents (9.7%);

    c.    Native Americans have the highest prevalence of use (47.5%) and disorders (15.0%); and

    d.    31.5% of Native Americans had substance-related disorders.

64.     The study concluded:

> Native Americans have the highest prevalence of substance use and substance-related disorders, adding to evidence that young Native Americans are a vulnerable group facing numerous stressors, trauma, and health disparities (e.g., highest rate of suicide, underfunded systems of care, and lack of access to appropriate care). The results herein highlight a critical need for intervention to reduce their burdens from substance use and for policies to address presently underfunded systems of care and improve infrastructures linking behavioral and primary health care services. [footnotes omitted.]

65.     The CDC reported that approximately 1 in 10 Native American youths ages 12 or older used prescription opioids for nonmedical purposes in 2012, double the rate for white youth.

66.     The fact that adolescents are able to easily obtain prescription opioids through the black market created by opioid diversion highlights the direct impact on Plaintiff and its community by Purdue and McKinsey's actions and inactions.

67.     Even the youngest members of tribal communities bear the consequences of the opioid abuse epidemic fueled by McKinsey's conduct working with Purdue and other manufacturers of opioids.  Between 2009 and 2012, "American Indian women [were] 8.7 times more likely to be diagnosed with maternal opiate dependence or abuse during pregnancy," compared to non-Hispanic women.  That translates into 1 in 10 pregnancies among American Indian women.  As a result, many tribal infants suffer from opioid withdrawal and Neonatal Abstinence Syndrome ("NAS").

68.     Infants suffering from NAS are separated from their families and placed into the custody of the tribal child welfare services or receive other government services so they can be afforded medical treatment and be protected from drug-addicted parents.

69.     The impact of NAS can be life-long. Most NAS infants are immediately transferred to a neonatal intensive care unit for a period of days, weeks, or even months. NAS can also require an emergency evacuation for care to save the infant's life. Such emergency transportation costs thousands of dollars for each occurrence.

70.     Many NAS infants have short-term and long-term developmental issues that prevent them from meeting basic cognitive and motor-skills milestones. Many will suffer from vision and digestive issues; some are unable to attend full days of school. These disabilities follow these children through elementary school and beyond.

71.     Many of the parents of these children continue to relapse into prescription opioid use and abuse, having an impact on their families and tribal communities for financial and other support.

G.      **The Impact of McKinsey's Work with Opioid Manufacturers on Plaintiff**

72.     The Band's own experience treating opioids illustrates these national trends and those of the tribal community generally.

73.     Indeed, the Band is currently facing a public health crisis that threatens to undermine the safety and well-being of the entire community living on and adjacent to the Fond du Lac Reservation. Overarching health, public safety and law enforcement concerns relate to, among others, prescription opioid drug abuse and major crimes involving opioid and drug use.

74.     It has been reported that pregnant Native Americans are up to 8.7 times more likely to be diagnosed with opioid dependency or abuse compared to the next highest race/ethnicity; and it has been reported that in some communities upwards of 1 in 10 pregnant Native Americans has a diagnosis of opioid dependency or abuse.  On information and belief, these statistics apply similarly to pregnant women who are Band Members or the mothers of Band Members or their descendants.

75.     Many of the parents of these Band Member children continue to relapse into prescription opioid use and lose custody of the children. As a result, many of these children are placed in foster care or adopted. The Band's foster care resources have been severely depleted.

76.     The opioid epidemic has escalated in the Band's community with devastating effects. Substantial opiate-related substance abuse, hospitalization, and death mirror the distribution of opioids.

77.     Because of the well-established relationship between the use of prescription opioids and the use of non-prescription opioids, such as heroin, the increasing distribution of opioids to members of the Band caused the opioid epidemic to include heroin addiction, abuse, and death.

This is particularly concerning in light of the recent influx of synthetic fentanyl products trafficked into and around the United States.

78.     In addition, there has been an increase in major crimes on the Band's reservation involving opioid use, including reports of human trafficking involving opioid abuse and addiction, undermining the safety of the members of the Band.

79.     Prescription opioid abuse, addiction, morbidity, and mortality are hazards to public health and safety in the Band's community.

80.     Costs for treatment related to the misuse, addiction, and/or overdose of opioids the Band has borne include but are not limited to the following:

a.     Emergency medical visits for opioid misuse, addiction, and/or overdose.

b.     Emergency medical visits for infections, injuries, illnesses, and drug-seeking related to opioid misuse, addiction, and/or overdose.

c.     Hospitalizations related to the misuse, addiction, and/or overdose of opioids.

d.     Increased costs of administering and staffing the Band's social services and resources aid (1) those members of the Band addicted to and/or dependent on opioids; (2) the resulting abuse or neglect of children and elders whose guardians are addicted to opioids; and (3) the many foster or adoptive guardians who take on the role of caretaker in their absence.

e.     Increased costs of administering and staffing the Band's public safety infrastructure, personnel, and resources to respond to increased opioid and related drug trafficking and human trafficking, including coordination with County and federal law enforcement.

f.     Care, education and support of pregnant women addicted to opioids and of their children born with NAS; including ongoing educational and developmental support to address the long-term consequences of fetal opioid exposure; and

g.     Treatment of victims and criminal offenders in the tribal court, including holistic community-based treatment programming and regular drug screening.

H.      **Tolling of Statutes of Limitations**

1.      **Equitable Estoppel and Fraudulent Concealment**

81.     McKinsey is equitably estopped from relying upon a statute of limitations defense because, alongside Purdue, McKinsey undertook active efforts to deceive the Plaintiff and to purposefully conceal their unlawful conduct and fraudulently assure the public and Plaintiff that they were undertaking efforts to comply with their obligations under the state and federal controlled substances laws, all with the goal of protecting their registered manufacturer or distributor status in the State and to continue generating profits.  Notwithstanding the allegations set forth above, McKinsey and Purdue affirmatively assured the public and Plaintiff that they were working to curb the opioid epidemic.

82.     McKinsey and Purdue were deliberate in taking steps to conceal their conspiratorial behavior and active role in the deceptive marketing and the oversupply of opioids through overprescribing and suspicious sales, all of which fueled the opioid epidemic.

83.     McKinsey's consulting services were given confidentially, and both McKinsey and Purdue concealed the content of those services from the public.

84.     McKinsey and Purdue also concealed from Plaintiff the existence of Plaintiff's claims by hiding their lack of cooperation with law enforcement and affirmatively seeking to convince the public that Purdue's legal duties to report suspicious sales had been satisfied through public assurances that they were working to curb the opioid epidemic. They publicly portrayed themselves as committed to working diligently with law enforcement and others to prevent diversion of these dangerous drugs and curb the opioid epidemic, and they made broad promises to change their ways insisting they were good corporate citizens.  These repeated misrepresentations misled regulators, prescribers and the public, including Plaintiff, and deprived

Plaintiff of actual or implied knowledge of facts sufficient to put Plaintiff on notice of potential claims.

85.     Plaintiff did not discover the nature, scope and magnitude of McKinsey's misconduct, and its full impact on Plaintiff, and could not have acquired such knowledge earlier through the exercise of reasonable diligence.

86.     Purdue and McKinsey's campaign to misrepresent and conceal the truth about the opioid drugs that they were aggressively pushing on Plaintiff deceived the medical community, consumers, and Plaintiff.

87.     Further, Purdue and other opioid manufacturers also concealed and prevented discovery of information, including data from the ARCOS database.

88.     McKinsey intended that their actions and omissions made with Purdue would be relied upon, including by Plaintiff.  Plaintiff did not know and did not have the means to know the truth, due to McKinsey and Purdue's actions and omissions.

89.     Plaintiff reasonably relied on McKinsey and Purdue's affirmative statements regarding their purported compliance with their obligations under the law and consent orders.

## 2.     McKinsey and Purdue Persisted in The Fraudulent Scheme Despite a Guilty Plea and Large Fine

90.     In May 2007, Purdue and three of its executives pled guilty to federal charges of misbranding OxyContin in what the company acknowledged was an attempt to mislead doctors about the risk of addiction.  Purdue was ordered to pay $600 million in fines and fees.  In its plea, Purdue admitted that its promotion of OxyContin was misleading and inaccurate, misrepresented the risk of addiction and was unsupported by science.  Additionally, Michael Friedman, the company's president, pled guilty to a misbranding charge and agreed to pay $19 million in fines; Howard R. Udell, Purdue's top lawyer, also pled guilty and agreed to pay $8 million in fines; and

Paul D. Goldenheim, its former medical director, pled guilty as well and agreed to pay $7.5 million in fines.

91.     Nevertheless, even after the settlement, Purdue continued to pay doctors on speakers' bureaus to promote the liberal prescribing of OxyContin for chronic pain and fund seemingly neutral organizations to disseminate the message that opioids were non-addictive as well as other misrepresentations.  At least until early 2018, Purdue continued to deceptively market the benefits of opioids for chronic pain while diminishing the associated dangers of addiction. After Purdue made its guilty plea in 2007, it assembled an army of lobbyists to fight any legislative actions that might encroach on its business.  Between 2006 and 2015, Purdue and other painkiller producers, along with their associated nonprofits, spent nearly $900 million dollars on lobbying and political contributions— eight times what the gun lobby spent during that period. McKinsey participated extensively in these actions and provided Purdue with strategies and assistance to maximize sales as described in this complaint.

92.     As all of the government actions against the Purdue and McKinsey demonstrate, McKinsey knew that the actions it took with Purdue were unlawful, and yet deliberately proceeded in order to increase Purdue's sales and profits, and in turn to serve McKinsey's financial interests.

## V.    FACTUAL ALLEGATIONS PERTAINING TO CLAIMS UNDER THE RACKETEER-INFLUENCED AND CORRUPT ORGANIZATIONS (RICO) ACT: THE OPIOID MARKETING ENTERPRISE

### A.    The Common Purpose and Scheme of the Opioid Marketing Enterprise

93.     Knowing that their products were highly addictive, ineffective and unsafe for the treatment of long-term chronic pain, non-acute and non-cancer pain, McKinsey, who participated in the marketing and sale of opioids as described in this complaint, and manufacturers of opioids, including Purdue, Johnson & Johnson, Cephalon, Janssen, Endo, and Mallinckrodt (collectively, including McKinsey, the "Opioid Marketing Enterprise Members") formed an association-in-fact

enterprise and engaged in a scheme to unlawfully increase their profits and sales, and grow their share of the prescription painkiller market, through repeated and systematic misrepresentations about the safety and efficacy of opioids for treating long-term chronic pain.

94.     In order to unlawfully increase the demand for opioids, the Opioid Marketing Enterprise Members formed an association-in-fact enterprise (the "Opioid Marketing Enterprise"). Through their personal relationships, the members of the Opioid Marketing Enterprise had the opportunity to form and take actions in furtherance of the Opioid Marketing Enterprise's common purpose. The Opioid Marketing Enterprise Members' substantial financial contribution to the Opioid Marketing Enterprise, and the advancement of opioids-friendly messaging, fueled the U.S. opioids epidemic.

95.     The Opioid Marketing Enterprise Members, through the Opioid Marketing Enterprise, concealed the true risks and dangers of opioids from the medical community and the public, including Plaintiff, and made misleading statements and misrepresentations about opioids that downplayed the risk of addiction and exaggerated the benefits of opioid use. The misleading statements included: (1) that addiction is rare among patients taking opioids for pain; (2) that addiction risk can be effectively managed; (3) that symptoms of addiction exhibited by opioid patients are actually symptoms of an invented condition the Opioid Marketing Enterprise Members named "pseudoaddiction"; (4) that withdrawal is easily managed; (5) that increased dosing presents no significant risks; (6) that long-term use of opioids improves function; (7) that the risks of alternative forms of pain treatment are greater than the adverse effects of opioids; (8) that use of time-released dosing prevents addiction; (9) that abuse-deterrent formulations provide a solution to opioid abuse; and (10) that opioids would bring patients freedom and peace of mind.

96.     The scheme devised, implemented and conducted by the Opioid Marketing Enterprise Members was a common course of conduct designed to ensure that the Opioid Marketing Enterprise Members unlawfully increased their sales and profits through concealment and misrepresentations about the addictive nature and effective use of the Opioid Marketing Enterprise Members' drugs.  The Opioid Marketing Enterprise Members acted together for a common purpose and perpetuated the Opioid Marketing Enterprise's scheme, including through the unbranded promotion and marketing network as described above.

97.     There was regular communication between the Opioid Marketing Enterprise Members in which information was shared, misrepresentations were coordinated, and payments were exchanged. The Opioid Marketing Enterprise Members functioned as a continuing unit for the purpose of implementing the Opioid Marketing Enterprise's scheme and common purpose, and each agreed and took actions to hide the scheme and continue its existence.

98.     As public scrutiny and media coverage focused on how opioids ravaged communities in throughout the United States, McKinsey did not challenge Purdue or other manufacturers' misrepresentations, seek to correct their previous misrepresentations, terminate their role in the Opioid Marketing Enterprise, nor disclose publicly that the risks of using opioids for chronic pain outweighed their benefits and were not supported by medically acceptable evidence. Instead, McKinsey continued to participate in the Opioid Marketing Enterprise for financial gain.

99.     The Opioid Marketing Enterprise Members engaged in certain discrete categories of activities in furtherance of the common purpose of the Opioid Marketing Enterprise. The Opioid Marketing Enterprise's conduct in furtherance of the common purpose of the Opioid Marketing

Enterprise involved misrepresentations regarding the risk of addiction and safe use of prescription opioids for long-term chronic pain, including targeting physicians with misleading claims.

100.    The impact of the Opioid Marketing Enterprise's scheme is still in place—*i.e.*, the opioids continue to be prescribed and used for chronic pain throughout the area of the Plaintiff, and the epidemic continues to injure Plaintiff, and consume Plaintiff's resources.

101.    As a result, it is clear that the Opioid Marketing Enterprise Members, including McKinsey, were each willing participants in the Opioid Marketing Enterprise, had a common purpose and interest in the object of the scheme, and functioned within a structure designed to effectuate the Enterprise's purpose.

**B.    The Conduct of the Opioid Marketing Enterprise Violated Civil RICO**

102.    From at least 2004 to the present, each of the Opioid Marketing Enterprise Members exerted control over the Opioid Marketing Enterprise and participated in the operation or management of the affairs of the Opioid Marketing Enterprise, directly or indirectly, in the following ways:

a.    Creating and providing a body of deceptive, misleading and unsupported medical and popular literature about opioids that (i) understated the risks and overstated the benefits of long-term use; (ii) appeared to be the result of independent, objective research; and (iii) was thus more likely to be relied upon by physicians, patients, and payors;

b.    Creating and providing a body of deceptive, misleading and unsupported electronic and print advertisements about opioids that (i) understated the risks and overstated the benefits of long-term use; (ii) appeared to be the result of independent, objective research; and (iii) was thus more likely to be relied upon by physicians, patients, and payors;

c.    Creating and providing a body of deceptive, misleading and unsupported sales and promotional training materials about opioids that (i) understated the risks and overstated the benefits of long-term use; (ii) appeared to be the result of independent, objective research; and (iii) was thus more likely to be relied upon by physicians, patients, and payors;

d.     Devised and implemented marketing schemes that included targeting and misleading physicians, unlawfully incentivizing sales representatives to maximize prescriptions and dosages, and evading regulatory constraints.

e.     Disseminating many of their false, misleading, imbalanced, and unsupported statements through unbranded materials that appeared to be independent publications; and

f.     Using front groups and key opinion leaders ("KOLs") to mislead the public about opioids.

103.   The scheme devised and implemented by the Opioid Marketing Enterprise Members amounted to a common course of conduct intended to increase the Opioid Marketing Enterprise Members' sales from prescription opioids by encouraging the prescribing and use of opioids for long-term chronic pain. The scheme was a continuing course of conduct, and many aspects of it continue through to the present.

### C.     Pattern of Racketeering Activity

104.   The Opioid Marketing Enterprise Members' scheme described herein was perpetrated, in part, through multiple acts of mail fraud and wire fraud, constituting a pattern of racketeering activity as described herein.

105.   The pattern of racketeering activity used by the Opioid Marketing Enterprise Members and the Opioid Marketing Enterprise likely involved thousands of separate instances of the use of the U.S. Mail or interstate wire facilities in furtherance of the unlawful Opioid Marketing Enterprise, including essentially uniform misrepresentations, concealments and material omissions regarding the beneficial uses and non-addictive qualities for the long-term treatment of chronic, non-acute and non-cancer pain, with the goal of profiting from increased sales of the Opioid Marketing Enterprise Members' drugs induced by consumers, prescribers, regulators and Plaintiff's reliance on the Opioid Marketing Enterprise Members' misrepresentations.

106.    Each of these fraudulent mailings and interstate wire transmissions constitutes racketeering activity and collectively, these violations constitute a pattern of racketeering activity, through which the Opioid Marketing Enterprise Members defrauded and intended to defraud Plaintiff, and other intended victims.

107.    The Opioid Marketing Enterprise Members devised and knowingly carried out an illegal scheme and artifice to defraud by means of materially false or fraudulent pretenses, representations, promises, or omissions of material facts regarding the safe, non-addictive and effective use of opioids for long-term chronic, non-acute and non-cancer pain.   The Opioid Marketing Enterprise Members and members of the Opioid Marketing Enterprise knew that these representations violated the FDA approved use these drugs, and were not supported by actual evidence.   The Opioid Marketing Enterprise Members intended that their common purpose and scheme to defraud would, and did, use the U.S. Mail and interstate wire facilities, intentionally and knowingly with the specific intent to advance, and for the purpose of executing, their illegal scheme.

108.    By intentionally concealing the material risks and affirmatively misrepresenting the benefits of using opioids for chronic pain, to, prescribers, regulators and the public, including Plaintiff, the Opioid Marketing Enterprise Members engaged in a fraudulent and unlawful course of conduct constituting a pattern of racketeering activity.

109.    The Opioid Marketing Enterprise Members' use of the U.S. Mail and interstate wire facilities to perpetrate the opioids marketing scheme involved thousands of communications, publications, representations, statements, electronic transmissions, payments, including, *inter alia*:

   a.    Marketing materials about opioids, and their risks and benefits, which the Opioid Marketing Enterprise Members sent to health care providers, transmitted through the internet and television, published, and transmitted to front groups and KOLs located across the country and Plaintiff;

- 24 -

b.   Written representations and telephone calls among the Opioid Marketing Enterprise Members, and between the Opioid Marketing Enterprise Members and front groups, regarding the misrepresentations, marketing statements and claims about opioids, including the non-addictive, safe use of chronic long-term pain generally;

c.   Written representations and telephone calls among the Opioid Marketing Enterprise Members, and between the Opioid Marketing Enterprise Members and KOLs regarding the misrepresentations, marketing statements and claims about opioids, including the non-addictive, safe use of chronic long-term pain generally

d.   E-mails, telephone and written communications among the Opioid Marketing Enterprise Members, and between the Opioid Marketing Enterprise Members and the front groups agreeing to or implementing the opioids marketing scheme;

e.   E-mails, telephone and written communications among the Opioid Marketing Enterprise Members, and between the Opioid Marketing Enterprise Members and the KOLs agreeing to or implementing the opioids marketing scheme;

f.   Communications among the Opioid Marketing Enterprise Members, and between the Opioid Marketing Enterprise Members, front groups and the media regarding publication, drafting of treatment guidelines, and the dissemination of the same as part of the Opioid Marketing Enterprise;

g.   Communications among the Opioid Marketing Enterprise Members, and between the Opioid Marketing Enterprise Members, KOLs and the media regarding publication, drafting of treatment guidelines, and the dissemination of the same as part of the Opioid Marketing Enterprise;

h.   Written and oral communications directed to Plaintiff and/or its members and that fraudulently misrepresented the risks and benefits of using opioids for chronic pain; and

i.   Receipts of increased profits sent through the U.S. Mail and interstate wire facilities—the wrongful proceeds of the scheme.

110.   In addition to the above-referenced predicate acts, it was intended by and foreseeable to the Opioid Marketing Enterprise Members that the front groups and the KOLs would distribute publications through the U.S. Mail and by interstate wire facilities, and, in those publications, claim that the benefits of using opioids for chronic pain outweighed the risks of doing so.

- 25 -

111.    To achieve the common goal and purpose of the Opioid Marketing Enterprise, the Opioid Marketing Enterprise Members and members of the Opioid Marketing Enterprise hid from the consumers, prescribers, regulators and the Plaintiff: (a) the fraudulent nature of the Opioid Marketing Enterprise Members' marketing scheme; (b) the fraudulent nature of statements made by the Opioid Marketing Enterprise Members and by their KOLs, front groups and other third parties regarding the safety and efficacy of prescription opioids; and (c) the true nature of the relationship between the members of the Opioid Marketing Enterprise.

112.    The Opioid Marketing Enterprise Members, and each member of the Opioid Marketing Enterprise agreed, with knowledge and intent, to the overall objective of the Opioid Marketing Enterprise Members' fraudulent scheme and participated in the common course of conduct to commit acts of fraud and indecency in marketing prescription opioids.

113.    Indeed, for the Opioid Marketing Enterprise Members' fraudulent scheme to work, each of them had to agree to implement similar tactics regarding fraudulent marketing of prescription opioids.  This conclusion is supported by the fact that opioid manufacturers among the Opioid Marketing Enterprise Members financed, supported, and worked through the same KOLs and Front groups, and often collaborated on and mutually supported the same publications, CMEs, presentations, and prescription guidelines.

114.    The Opioid Marketing Enterprise Members' predicate acts all had the purpose of creating the opioid epidemic that substantially injured Plaintiff's business and property, while simultaneously generating billion-dollar revenue and profits for the Opioid Marketing Enterprise Members.  The predicate acts were committed or caused to be committed by the Opioid Marketing Enterprise Members through their participation in the Opioid Marketing Enterprise and in furtherance of its fraudulent scheme.

## VI.  CAUSES OF ACTION

**A.  Count I: Racketeer Influenced and Corrupt Organizations (RICO), 18 U.S.C. § 1961, *et seq.***

115.    Plaintiff incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein and further allege as follows:

116.    This claim is brought by Plaintiff against Defendant McKinsey for actual damages, treble damages, and equitable relief under 18.U.S.C. § 1964, for violations of 18 U.S.C. § 1961, et seq.

117.    At all relevant times, McKinsey is and has been a "person" under 18 U.S.C. § 1961(3) because it is capable of holding, and does hold, "a legal or beneficial interest in property."

118.    Plaintiff is a "person," as that term is defined in 18 U.S.C. § 1961(3), and has standing to sue as it was and is injured in its business and/or property as a result of Defendant's wrongful conduct described herein.

119.    The Opioid Marketing Enterprise conducted an association-in-fact enterprise, and/or participated in the conduct of an enterprise, through a pattern of illegal activities (the predicate racketeering acts of mail and wire fraud) to carry out the common purpose of the Opioid Marketing Enterprise, i.e., to unlawfully increase profits and revenues from the continued prescription and use of opioids for long-term chronic pain.  Through the racketeering activities of the Opioid Marketing Enterprise, the Opioid Marketing Enterprise Members sought to further the common purpose of the Enterprise through a fraudulent scheme to change prescriber habits and public perception about the safety and efficacy of opioid use.  In so doing, each of the Opioid Marketing Enterprise Members knowingly conducted and participated in the conduct of the Opioid Marketing Activities by engaging in mail and wire fraud in violation of 18 U.S.C. §§ 1962(c) and (d).

- 27 -

120.    The Opioid Marketing Enterprise is an association-in-fact enterprise that consists of the Opioid Marketing Enterprise Members.

121.    Each of the Opioid Marketing Enterprise Members conducted and participated in the conduct of the Opioid Marketing Enterprise by playing a distinct role in furthering the Enterprise's common purpose of increasing profits and sales through the knowing and intentional dissemination of false and misleading information about the safety and efficacy of long-term opioid use, and the risks and symptoms of addiction, in order to increase the market for prescription opioids by changing prescriber habits and public perceptions.

122.    Specifically, the Opioid Marketing Enterprise Members each worked together to coordinate the Enterprise's goals and conceal their role, and the Enterprise's existence, from the public by, among other things, (i) funding, editing, and distributing publications that supported and advanced their false messages; (ii) funding KOLs to further promote their false messages; and (iii) tasking their own employees to direct deceptive marketing materials and pitches directly at physicians.

123.    Further, each of the Opioid Marketing Enterprise Members had systematic links to and personal relationships with each other through joint participation in lobbying groups, trade industry organizations, contractual relationships, and continuing coordination of activities.  The systematic links and personal relationships that were formed and developed allowed members of the Opioid Marketing Enterprise the opportunity to form the common purpose and agree to conduct and participate in the conduct of the Opioid Marketing Enterprise.  Specifically, each of the Opioid Marketing Enterprise Members, including McKinsey working with and through the other Opioid Marketing Enterprise Members, coordinated their efforts through the same KOLs and front groups based on their agreement and understanding that the front groups and KOLs were industry friendly

and would work together with the Opioid Marketing Enterprise Members to advance the common purpose of the Opioid Marketing Enterprise, and each of the individuals and entities who formed the Opioid Marketing Enterprise acted to enable the common purpose and fraudulent scheme of the Opioid Marketing Enterprise.

124.    At all relevant times, the Opioid Marketing Enterprise: (a) had an existence separate and distinct from each RICO Marketing Defendant and its members; (b) was separate and distinct from the pattern of racketeering in which the Opioid Marketing Enterprise Members engaged; (c) was an ongoing and continuing organization consisting of individuals, persons, and legal entities, including each of the Opioid Marketing Enterprise Members; (d) was characterized by interpersonal relationships between and among each member of the Opioid Marketing Enterprise; and (e) had sufficient longevity for the Enterprise to pursue its purpose and functioned as a continuing unit.

125.    The Opioid Marketing Enterprise Members conducted and participated in the conduct of the Opioid Marketing Enterprise through a pattern of racketeering activity that employed the use of mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud), to increase profits and revenue by changing prescriber habits and public perceptions in order to increase the prescription and use of prescription opioids and expand the market for opioids.

126.    The Opioid Marketing Enterprise Members each committed, conspired to commit, and/or aided and abetted in the commission of at least two predicate acts of racketeering activity (i.e., violations of 18 U.S.C. §§ 1341 and 1343) within the past ten years.  The multiple acts of racketeering activity that the Opioid Marketing Enterprise Members committed, or aided and abetted in the commission of, were related to each other, posed a threat of continued racketeering

activity, and therefore constitute a "pattern of racketeering activity."  The racketeering activity was made possible by the Opioid Marketing Enterprise Members' regular use of the facilities, services, distribution channels, and employees of the Opioid Marketing Enterprise, the U.S. Mail, and interstate wire facilities.  The Opioid Marketing Enterprise Members participated in the scheme to defraud by using mail, telephones, and the Internet to transmit mailings and wires in interstate or foreign commerce.

127.    The Opioid Marketing Enterprise Members' predicate acts of racketeering (18 U.S.C. § 1961(1)) include, but are not limited to:

    a.  Mail Fraud: The Opioid Marketing Enterprise Members violated 18 U.S.C. § 1341 by sending or receiving, or by causing to be sent and/or received, materials via U.S. mail or commercial interstate carriers for the purpose of executing the unlawful scheme to design, manufacture, market, and sell the prescription opioids by means of false pretenses, misrepresentations, promises, and omissions.

    b.  Wire Fraud: The Opioid Marketing Enterprise Members violated 18 U.S.C. § 1343 by transmitting and/or receiving, or by causing to be transmitted and/or received, materials by wire for the purpose of executing the unlawful scheme to design, manufacture, market, and sell the prescription opioids by means of false pretenses, misrepresentations, promises, and omissions.

128.    Indeed, as summarized herein, the Opioid Marketing Enterprise Members used the mail and wires to send or receive thousands of communications, publications, representations, statements, electronic transmissions, and payments to carry out the Opioid Marketing Enterprise's fraudulent scheme.

129.    Because the Opioid Marketing Enterprise Members disguised their participation in the Enterprise, and worked to keep even the Enterprise's existence secret so as to give the false appearance that their false messages reflected the views of independent third parties, many of the precise dates of the Opioid Marketing Enterprise's uses of the U.S. Mail and interstate wire facilities (and corresponding predicate acts of mail and wire fraud) have been hidden and cannot be alleged without access to the books and records maintained by the Opioid Marketing Enterprise

Members, front groups, and KOLs.  Indeed, an essential part of the successful operation of the Opioid Marketing Enterprise alleged herein depended upon secrecy.  However, Plaintiffs have described the occasions on which the Opioid Marketing Enterprise Members disseminated misrepresentations and false statements to consumers, prescribers, regulators, and Plaintiffs, as well as how those acts were in furtherance of the scheme.

130.   Each instance of racketeering activity alleged herein was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including consumers, prescribers, regulators, and Plaintiffs.  The Opioid Marketing Enterprise Members calculated and intentionally crafted the scheme and common purpose of the Opioid Marketing Enterprise to ensure their own profits remained high. In designing and implementing the scheme, the Opioid Marketing Enterprise Members understood and intended that those in the distribution chain rely on the integrity of the pharmaceutical companies and ostensibly neutral third parties to provide objective and scientific evidence regarding the Opioid Marketing Enterprise Members' products.

131.   The Opioid Marketing Enterprise Members' pattern of racketeering activity alleged herein and the Opioid Marketing Enterprise are separate and distinct from each other.  Likewise, the Opioid Marketing Enterprise Members are distinct from the Opioid Marketing Enterprise.

132.   The racketeering activities conducted by the Opioid Marketing Enterprise Members amounted to a common course of conduct, with a similar pattern and purpose, intended to deceive consumers, prescribers, regulators, and the Plaintiffs.  Each separate use of the U.S. Mail and/or interstate wire facilities employed by Defendant was related, had similar intended purposes, involved similar participants and methods of execution, and had the same results affecting the same victims, including consumers, prescribers, regulators, and the Plaintiffs.   The Opioid

Marketing Enterprise Members have engaged in the pattern of racketeering activity for the purpose of conducting the ongoing business affairs of the Opioid Marketing Enterprise.

133.    Each of the Opioid Marketing Enterprise Members aided and abetted others in the violations of the above laws, thereby rendering them indictable as principals in the 18 U.S.C. §§ 1341 and 1343 offenses.

134.    As described herein, the Opioid Marketing Enterprise Members engaged in a pattern of related and continuous predicate acts for years.  The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of obtaining significant money and revenue from the marketing and sale of their highly addictive and dangerous drugs.  The predicate acts also had the same or similar results, participants, victims, and methods of commission.  The predicate acts were related and not isolated events.

135.    The Opioid Marketing Enterprise Members' violations of law and their pattern of racketeering activity directly and proximately caused Plaintiffs injury in their business and property.  The Opioid Marketing Enterprise Members' pattern of racketeering activity logically, substantially, and foreseeably caused an opioid epidemic.  Plaintiffs' injuries, as described below, were not unexpected, unforeseen, or independent.  Rather, as Plaintiffs allege, the Opioid Marketing Enterprise Members knew that opioids were unsuited to treatment of long-term chronic, non-acute, and non-cancer pain, or for any other use not approved by the FDA, and knew that opioids were highly addictive and subject to abuse.  Nevertheless, the Opioid Marketing Enterprise Members engaged in a scheme of deception that utilized the mail and wires in order to carry out the Opioid Marketing Enterprises' fraudulent scheme, thereby increasing sales of their opioid products.

136.    It was foreseeable and expected that the Opioid Marketing Enterprise Members creating and then participating in the Opioid Marketing Enterprise through a pattern of racketeering activities to carry out their fraudulent scheme would lead to a nationwide opioid epidemic, including increased opioid addiction and overdose.

137.    Defendant's misleading marketing and failure to prevent prescription opioid diversion damaged Plaintiff and their members and community.  Defendant's misconduct has contributed to a range of social problems, including violence and delinquency.  Adverse social outcomes include child neglect, family dysfunction, babies born addicted to opioids, criminal behavior, poverty, property damage, unemployment, and social despair.  As a result, more and more of Plaintiff's resources are devoted to addiction-related problems.

138.    Specifically, the Opioid Marketing Enterprise Members' creation of, and then participation in, the Opioid Marketing Enterprise through a pattern of racketeering activities to carry out their fraudulent scheme has injured Plaintiff in the form of substantial losses of money and property that logically, directly, and foreseeably arise from the opioid-addiction epidemic. Plaintiff's injuries, as alleged throughout this Complaint and expressly incorporated herein by reference, include:

    a.    Costs for providing healthcare and medical care, additional therapeutic, and prescription drug purchases, and other treatments for patients suffering from opioid-related addiction or disease, including overdoses and deaths;

    b.    Costs of training first responders in the proper treatment of drug overdoses;

    c.    Costs associated with providing first responders with naloxone—an opioid antagonist used to block the deadly effects of opioids in the context of overdose;

    d.    Costs associated with emergency responses by first responders to opioid overdoses;

    e.    Costs for providing mental-health services, treatment, counseling, rehabilitation services, and social services to victims of the opioid epidemic and their families;

f.   Costs for providing treatment of infants born with opioid-related medical conditions, or born dependent on opioids due to drug use by mother during pregnancy;

g.   Costs associated with the injuries to the health and welfare of the Plaintiff and their members caused by the opioid epidemic;

h.   Costs associated with providing care for children whose parents suffer from opioid-related disability or incapacitation;

i.   Losses caused by the diversion of revenue from Plaintiff's businesses to address the opioid epidemic that would otherwise have been reinvested in Plaintiff's businesses; and

j.   Costs associated with removal of hazardous waste from Plaintiff's communities, including on Plaintiff's real property.

139.   Plaintiff's injuries were directly and thus proximately caused by these racketeering activities because they were the logical, substantial, and foreseeable cause of Plaintiff's injuries. But for the opioid-addiction epidemic the Opioid Marketing Enterprise Members created through their Opioid Marketing Enterprise, Plaintiff would not have lost money or property, and the health and welfare of Plaintiff and its members would not have been injured.

140.   Plaintiff is the most directly harmed entities and there are no other plaintiffs better suited to seek a remedy for the economic harms at issue here.

141.   As a result of the conduct of McKinsey, Plaintiff has been and continues to be injured in an amount to be determined in this litigation.

142.   Pursuant to 18 U.S.C. § 1964 (c), Plaintiff is entitled to recover threefold their damages, costs, and attorney's fees.  In addition, Plaintiff is entitled to injunctive relief to enjoin the racketeering activity.

**B.     Count II: Public Nuisance Pursuant to Minn. Stat. § 609.74**

143.   Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth herein and further alleges as follows:

144.   McKinsey has created and/or assisted in the creation of a condition that unreasonably annoys, injures or endangers the safety, health, morals, comfort, or repose of any considerable number of members of the public.  By creating the opioid epidemic, McKinsey caused a condition that unreasonably annoys, injures or endangers the safety, health, morals, comfort, or repose of an entire community, namely the Band.

145.   McKinsey knew and should have known that its promotion of opioids was false and misleading and that its deceptive marketing scheme and other unlawful, unfair, and fraudulent actions would create or assist in the creation of the public nuisance--the opioid epidemic.

146.   McKinsey's actions were, at the very least, a substantial factor in opioids becoming widely available and widely used and a substantial factor in deceiving doctors and patients about the risks and benefits of opioids for the treatment of chronic pain. Without McKinsey's actions, opioid use, misuse, abuse, and addiction would not have become so widespread, and the opioid epidemic that now exists would have been averted or much less severe.

147.   McKinsey has breached its duties to Plaintiff by disseminating false and misleading information through opioid manufacturers regarding the dangers of opioid use and by targeting physicians likely to prescribe opioids for pain management despite the availability of other, less- or non-addictive pain killers.

148.   Working through these opioid manufacturers, McKinsey unlawfully provided false or misleading material information about prescription opioids or unlawfully failed to use reasonable care or comply with statutory requirements in the distribution of prescription opioids.

149.   McKinsey's acts and omissions created the opioid epidemic and thereby maintained or permitted a condition which unreasonably annoys, injures or endangers the safety, health, morals, comfort, or repose of Plaintiff and Plaintiff's citizens.

150.    McKinsey's activities have created the opioid epidemic and thereby maintained or permitted a condition which unreasonably annoys, injures or endangers the safety, health, morals, comfort, or repose of Plaintiff and its citizens, including the common rights:

a.      to be free from reasonable apprehension of danger to person and property;

b.      to be free from the spread of disease within the community, including the disease of addiction and other diseases associated with widespread illegal opioid use;

c.      to be free from the negative health and safety effects of widespread illegal drug sales on premises on and around Plaintiff's community;

d.      to be free from blights on the community created by areas of illegal drug use and opioid sales;

e.      to live or work in a community in which local businesses do not profit from using their premises to sell products that serve the criminal element and foster a secondary market of illegal transactions; and

f.      to live or work in a community in which community members are not under the influence of narcotics unless they have a legitimate medical need to use them.

151.    McKinsey's acts and omissions threatened and directly harmed the health and welfare of the Plaintiff and its citizens.

152.    McKinsey also has a duty to abate the nuisance caused the by prescription opioid epidemic.

153.    The public nuisance created, perpetuated, and maintained by McKinsey can be abated and further recurrence of such harm and inconvenience can be abated.

154.    McKinsey has failed to abate the nuisance they created.

155.    Plaintiff seeks an order providing for abatement of the public nuisance that McKinsey created or assisted in the creation of and enjoining McKinsey from future conduct creating a public nuisance.

156.    As a direct result of McKinsey's conduct, Plaintiff has suffered actual injury and economic damages including, but not limited to, significant expenses for police, emergency, health, education and training, prosecution, child protection, corrections, judicial, and other services.

157.    McKinsey is liable to Plaintiff for the costs borne by the Plaintiff because of the opioid epidemic and for the costs of abating the nuisance created by McKinsey.

158.    McKinsey's interference with these public rights has been, is, and will continue to be unreasonable and objectionable because it:

    a.    has harmed and will continue to harm the public health and public peace of Plaintiff;

    b.    has harmed and will continue to harm Plaintiff's neighborhoods and communities by increasing crime, and thereby interfering with the rights of the community at large;

    c.    violates statutory and common law duties;

    d.    is of a continuing nature, and has produced long-lasting effects; and

    e.    is known to McKinsey that its conduct has a significant effect upon the public rights of Plaintiff and its citizens.

159.    In addition, and independently, McKinsey's conduct invades a legally protected interest. McKinsey's conduct constitutes an unreasonable, intentional, and substantial interference because, *inter alia*, each co-conspirator has conducted a fraudulent campaign to misrepresent knowingly the safety and efficacy of opioid drugs and to ensure their widespread use for chronic pain.

160.    Because the co-conspirators have marketed and sold prescription opioids in a manner contrary to law and because McKinsey's conduct has unreasonably, intentionally, and

substantially interfered with a right common to the general public, McKinsey is liable for public nuisance.

161.    The nuisance has affected Plaintiff in that it has undermined, is undermining, and will continue to undermine the public health, quality of life, and safety of Plaintiff's citizens. It has resulted in increased crime and property damage within the Plaintiff's community and in high rates of addiction, overdoses, and dysfunction within Plaintiff's families and communities.

162.    Plaintiff's resources have been, are being, and will be consumed in efforts to address the opioid epidemic, thereby rendering unavailable resources that could be used to benefit Plaintiff.

163.    McKinsey's actions and omissions annoy, injure, and endanger the comfort, repose, health, and safety of Plaintiff, offend decency, and render Plaintiff's citizens insecure in their lives and the use of property.

164.    McKinsey's nuisance-causing activities are not outweighed by their utility. In fact, these activities are illegal and have no social utility whatsoever. There is no legitimately recognized societal interest in marketing and selling prescription opioids through false and misleading representations.

165.    As a direct and proximate result of the nuisance caused by McKinsey's and others, Plaintiff's citizens have been injured in their ability to enjoy rights common to the public.

166.    Plaintiff has suffered special injury different in kind from the general public because American Indian populations are more vulnerable to opioid abuse and the damage caused by the nuisance has inflicted harm on the very fabric of Plaintiff's culture and threatened its continued existence as a sovereign nation.

167.    Plaintiff has also suffered unique harms of a kind that are different from its citizens at large, namely, that Plaintiff has been harmed in its proprietary interests.

168.    Plaintiff's injuries, as alleged throughout this Complaint and expressly incorporated herein by reference, include:

a.    Costs for providing healthcare and medical care, additional therapeutic, and prescription drug purchases, and other treatments for patients suffering from opioid-related addiction or disease, including overdoses and deaths;

b.    Costs of training first responders in the proper treatment of drug overdoses;

c.    Costs associated with providing first responders with naloxone—an opioid antagonist used to block the deadly effects of opioids in the context of overdose;

d.    Costs associated with emergency responses by first responders to opioid overdoses;

e.    Costs for providing mental-health services, treatment, counseling, rehabilitation services, and social services to victims of the opioid epidemic and their families;

f.    Costs for providing treatment of infants born with opioid-related medical conditions, or born dependent on opioids due to drug use by mother during pregnancy;

g.    Costs associated with the injuries to the health and welfare of the Plaintiff and their members caused by the opioid epidemic;

h.    Costs associated with providing care for children whose parents suffer from opioid-related disability or incapacitation;

i.    Losses caused by the diversion of revenue from Plaintiff's businesses to address the opioid epidemic that would otherwise have been reinvested in Plaintiff's businesses; and

j.    Costs associated with removal of hazardous waste from Plaintiff's communities, including on Plaintiff's real property.

**C.    Count III: Negligence and Negligence Per Se**

169.    Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth herein and further alleges as follows:

170.   The opioid epidemic was a direct, legal, and proximate result of McKinsey's negligence. As a direct, proximate, and legal result of said negligence, Plaintiff suffered damages as alleged herein.

171.   McKinsey, through its work with opioid manufacturers, owed Plaintiff a duty to not expose the Plaintiff to an unreasonable risk of harm.

172.   McKinsey had a legal duty to exercise reasonable and ordinary care and skill in accordance with applicable standards of conduct in its work relating to advising, consulting, and facilitating the marketing, selling and/or distributing opioids.

173.   McKinsey breached its duty to the Plaintiff by, *inter alia*, advising Purdue and other opioid manufacturers to implement sales and marketing strategies designed to increase sales of OxyContin.

174.   McKinsey breached its duty to the Plaintiff by working with opioid manufacturers to market opioids deceptively, including by downplaying the risks of addiction and overdose and exaggerating the purported benefits of long-term use of opioids for the treatment of chronic pain.

175.   It was reasonably foreseeable that McKinsey's actions and omissions would result in the harm to the Plaintiff described herein.

176.   McKinsey's failure to comply with its duties of care proximately caused damage to the Plaintiff.

177.   The negligence of McKinsey was a substantial factor in causing the Plaintiff's damages. But for McKinsey's services, Purdue and other opioid manufacturers would not have been able to increase sales in the years following the 2007 guilty plea, including the five years under the Corporate Integrity Agreement and the years since its expiration.

178.   As a further direct and proximate result of McKinsey's negligence, the Plaintiff suffered injuries.

179.   Plaintiff's injuries, as alleged throughout this Complaint and expressly incorporated herein by reference, include:

a.   Costs for providing healthcare and medical care, additional therapeutic, and prescription drug purchases, and other treatments for patients suffering from opioid-related addiction or disease, including overdoses and deaths;

b.   Costs of training first responders in the proper treatment of drug overdoses;

c.   Costs associated with providing first responders with naloxone—an opioid antagonist used to block the deadly effects of opioids in the context of overdose;

d.   Costs associated with emergency responses by first responders to opioid overdoses;

e.   Costs for providing mental-health services, treatment, counseling, rehabilitation services, and social services to victims of the opioid epidemic and their families;

f.   Costs for providing treatment of infants born with opioid-related medical conditions, or born dependent on opioids due to drug use by mother during pregnancy;

g.   Costs associated with the injuries to the health and welfare of the Plaintiff and their members caused by the opioid epidemic;

h.   Costs associated with providing care for children whose parents suffer from opioid-related disability or incapacitation;

i.   Losses caused by the diversion of revenue from Plaintiff's businesses to address the opioid epidemic that would otherwise have been reinvested in Plaintiff's businesses; and

j.   Costs associated with removal of hazardous waste from Plaintiff's communities, including on Plaintiff's real property.

**D.   Count IV: Civil Conspiracy**

180.   Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth herein and further alleges as follows:

- 41 -

181.    McKinsey engaged, and continues to engage, with opioid manufacturers in a
massive marketing campaign to misstate and conceal the risks of treating long-term chronic, non-
acute, and non-cancer pain with opioids as described in this Complaint. Their aggressive marketing
campaign enabled them to overcome the longstanding medical consensus that opioids were unsafe
for the treatment of chronic pain and resulted in a significant increase in the number of opioids
prescribed nationwide.

182.    Without McKinsey's and its co-conspirators' misrepresentations, which created
demand, they would not have been able to sell the increasing quantity of prescription opioids for
non-medical or inappropriate purposes.

183.    None of the opioid manufacturers or McKinsey would have succeeded in profiting
so much from the opioid epidemic without the concerted conduct of the other parties.

184.    McKinsey and its co-conspirators agreed with each other to accomplish the
unlawful purposes of marketing, selling, and distributing prescription opioids through violations
of law and misrepresentations. McKinsey and its co-conspirators performed numerous overt acts
in furtherance of this conspiracy, including marketing, selling, and distributing prescription
opioids by means of misrepresentations and omissions, violating state law, and turning a blind eye
to diversion of prescription opioids.

185.    As a result of the concerted action between McKinsey and its co- conspirators,
Plaintiff and their citizens have suffered injuries.

186.    Plaintiff's injuries, as alleged throughout this Complaint and expressly incorporated
herein by reference, include:

   a.    Costs for providing healthcare and medical care, additional therapeutic, and
         prescription drug purchases, and other treatments for patients suffering from
         opioid-related addiction or disease, including overdoses and deaths;

b.      Costs of training first responders in the proper treatment of drug overdoses;

c.      Costs associated with providing first responders with naloxone—an opioid antagonist used to block the deadly effects of opioids in the context of overdose;

d.      Costs associated with emergency responses by first responders to opioid overdoses;

e.      Costs for providing mental-health services, treatment, counseling, rehabilitation services, and social services to victims of the opioid epidemic and their families;

f.      Costs for providing treatment of infants born with opioid-related medical conditions, or born dependent on opioids due to drug use by mother during pregnancy;

g.      Costs associated with the injuries to the health and welfare of the Plaintiff and their members caused by the opioid epidemic;

h.      Costs associated with providing care for children whose parents suffer from opioid-related disability or incapacitation;

i.      Losses caused by the diversion of revenue from Plaintiff's businesses to address the opioid epidemic that would otherwise have been reinvested in Plaintiff's businesses; and

j.      Costs associated with removal of hazardous waste from Plaintiff's communities, including on Plaintiff's real property.

**E.    Count V: Unjust Enrichment**

187.    Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth herein and further alleges as follows:

188.    As an expected and intended result of its conscious wrongdoing as set forth in this Complaint, McKinsey has profited and benefited from the increase in the distribution and purchase of opioids within the Plaintiff's communities, including from opioids foreseeably and deliberately diverted within and into the Plaintiff's communities.

189.    The Plaintiff has expended substantial amounts of money to fix or mitigate the societal harms caused by McKinsey's conduct.

190.    Plaintiff has conferred a benefit upon McKinsey by paying for McKinsey's externalities--the costs of the harm caused by McKinsey's negligent or otherwise unlawful practices.

191.    McKinsey is aware of this obvious benefit and that retention of this benefit is unjust.

192.    McKinsey made substantial profits while fueling the prescription drug epidemic in Plaintiff's community.

193.    McKinsey has been unjustly enriched by its negligent, intentional, malicious, oppressive, illegal, and unethical acts, omissions, and wrongdoing.

194.    It would be inequitable to allow McKinsey to retain benefit or financial advantage.

195.    McKinsey's misconduct alleged in this case has caused ongoing and persistent harm to Plaintiff.

196.    Plaintiff demands judgment against McKinsey for restitution, disgorgement, and any other relief allowed in law or equity.

**F.    Count VI: Violation of Minn. Stat. § 325F.68 – Prevention of Consumer Fraud**

197.    Plaintiff incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein and further allege as follows.

198.    Minnesota Statute 325F.68 prohibits misrepresenting the quality of goods, as well as sales sounding in fraud, misrepresentation, or deceptive practices, providing in pertinent part:

> 325F.68 UNLAWFUL PRACTICES.   Subdivision 1. Fraud, misrepresentation, deceptive practices. The act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby, is enjoinable as provided in section 325F.70.

199.    The term "merchandise" within the meaning of Minnesota Statutes section 325F.69 includes goods, such as prescription drugs.  See Minn. Stat. § 325F.68, subd. 2.

- 44 -

200.    The term "person" includes any partnership or corporation, foreign or domestic. Minn. Stat. § 325F.68, subd. 3.  McKinsey is a "person" within the meaning of this statute.

201.    The opioid drugs have been advertised and sold within the meaning of § 325F.68, subd. 4.

202.    McKinsey knowingly made untrue, deceptive, or misleading representations, with the intent that the Plaintiff and others rely on McKinsey's untrue, deceptive, or misleading representations in connection with the sale or advertisement of prescription opioids, as more fully described above.  These untrue, deceptive, or misleading statements included, but were not limited to:

    a.    Misrepresenting the truth about how opioids lead to addiction;

    b.    Misrepresenting that opioids improve function;

    c.    Misrepresenting that addiction can be managed;

    d.    Misleading doctors, patients, and payors through the use of misleading terms like "pseudoaddiction";

    e.    Falsely claiming that withdrawal was simply managed;

    f.    Misrepresenting that increased doses pose no significant additional risks;

    g.    Falsely omitting or minimizing the adverse effects of opioids and overstating the risks of alternative forms of pain treatment; and

    h.    Other representations as more fully described above.

203.    McKinsey's representations were untrue, deceptive, and/or misleading, in violation of Minn. Stat. § 325F.68 *et seq*.

204.    McKinsey's untrue, deceptive, and/or misleading representations in connection with the sale or advertisement of prescription opioids caused substantial injury to Plaintiff.

205.    McKinsey's violations of Minn. Stat. § 325F.68 *et seq*. directly and proximately caused Plaintiff to suffer pecuniary losses in an amount to be determined in this litigation.

G.   **Count VII: Violation of Minn. Stat. § 325D.09 *et seq*. – Unlawful Trade Practices**

206.   Plaintiff realleges and incorporates by reference the foregoing allegations as if set forth at length herein.

207.   Minnesota Statutes § 325D.13 reads in pertinent part:

325D.13 QUALITY, MISREPRESENTED No person shall, in connection with the sale of merchandise, knowingly misrepresent, directly or indirectly, the true quality, ingredients, or origin of such merchandise.

208.   McKinsey is a person for purposes of this statute.

209.   Opioid products are merchandise for purposes of this statute.

210.   McKinsey has misrepresented the addictive quality of opioids.  McKinsey engaged in an aggressive marketing campaign, which in part sought to downplay the dangerousness of opioids, while promoting them for chronic pain for which they knew the drug was not safe or suitable.

211.   Because of the dangerously addictive nature of these drugs, McKinsey's marketing practices, and the practices of its conspirators, caused an opioid epidemic in Plaintiff's community.

212.   As alleged herein, McKinsey wrongfully represented that the opioid prescription medications manufactured, marketed, distributed, and sold by the co-conspirators, had characteristics, uses, or benefits that they do not have.

213.   McKinsey and its co-conspirators also represented that opioids are safe and effective when such representations were untrue, false, and misleading.

214.   Because of the dangerously addictive nature of these drugs, which McKinsey concealed and misrepresented, they lacked medical value, and in fact caused addiction and overdose deaths; therefore, McKinsey's conduct constituted a violation of state law.

215.    McKinsey made misrepresentations about the use of opioids to treat chronic non-cancer pain.

216.    Because of McKinsey's omissions and misrepresentations to, *inter alia*, Plaintiff its residents, and their agents, Plaintiff has suffered significant damages, including, but not limited to those alleged throughout this Complaint, which are expressly incorporated by reference.

217.    The damages which Plaintiff seeks to recover were sustained as a direct and proximate cause of McKinsey's intentional acts and omissions.

218.    Plaintiff seeks injunctive relief and actual damages under Minn. Stat. § 325D.15 as well as under Minn. Stat. § 8.31, which creates a private right of action when the action would benefit the public. The present action benefits the public, both in Plaintiff's community, as well as in Minnesota, by stemming the flow of diverted opioid drugs into the state, and providing Plaintiff with the necessary resources, both monetary and non-monetary, to redress the opioid epidemic and treat its victims.

H.    **Count VIII: Violation of Minn. Stat. § 325D.43 *et seq*. – Deceptive Trade Practices**

219.    Plaintiff realleges and incorporates by reference the foregoing allegations as if set forth at length herein.

220.    Minnesota Statute § 325D.44 reads, in pertinent part:

325D.44 DECEPTIVE TRADE PRACTICES A person engages in a deceptive trade practice when, in the course of business, vocation, or occupation, the person…(5) represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have…(7) represents that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another…(13) engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.

221.    McKinsey's unfair, deceptive, and unconscionable representations, concealments, and omissions were reasonably calculated to create confusion and misunderstanding as to the nature and efficacy of opioid drugs, and in doing so deceive the Band and its residents.

222.    As alleged herein, McKinsey has misrepresented the addictive quality of opioids. McKinsey engaged with its co-conspirators in an aggressive marketing campaign, which in part sought to downplay the dangerousness of opioids, while promoting them for chronic pain for which they knew the drug was not safe or suitable.

223.    Because of the dangerously addictive nature of these drugs, McKinsey's conduct caused an opioid epidemic in Plaintiff's community.

224.    McKinsey wrongfully represented that opioids had characteristics, uses, or benefits that they do not have.

225.    McKinsey also wrongfully misrepresented that opioids were safe and effective when such representations were untrue, false, and misleading.

226.    Because of the dangerously addictive nature of these drugs, which McKinsey concealed and misrepresented, they lacked medical value, and in fact caused addiction and overdose deaths; therefore, McKinsey's conduct constituted a violation of state law.

227.    McKinsey made misrepresentations about the use of opioids to treat chronic non-cancer pain.

228.    Because of McKinsey's omissions and misrepresentations to, *inter alia*, Plaintiff its residents, and their agents, Plaintiff has suffered significant damages, including, but not limited to those alleged throughout this Complaint, which are expressly incorporated by reference.

229.    The damages which Plaintiff seeks to recover were sustained as a direct and proximate cause of McKinsey's intentional acts and omissions.

230.     Plaintiff seeks injunctive relief and actual damages under Minn. Stat. § 325D.45 as well as under Minn. Stat. § 8.31, which creates a private right of action when the action would benefit the public. The present action benefits the public, both in Plaintiff's community, as well as in Minnesota, by stemming the flow of diverted opioid drugs into the state, and providing Plaintiff with the necessary resources, both monetary and non-monetary, to redress the opioid epidemic and treat its victims.

## VII:   **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests judgment in its favor granting the following relief:

a.     Entering Judgment in favor of Plaintiff in a final order against McKinsey;

b.     An award of actual damages and treble damages, including pre-suit and post-judgment interest;

c.     An order enjoining any further violations of RICO;

d.     An order enjoining any further violations of any statutes alleged to have been violated in this Complaint;

e.     An order enjoining the commission of any tortious conduct, as alleged in this Complaint;

f.     An order enjoining any future marketing or misrepresentations regarding the health benefits or risks of prescription opioids use, except as specifically approved by the FDA;

g.     An order enjoining any future marketing of opioids through non-branded marketing including through front groups, KOLs, websites, or in any other manner alleged in this Complaint that deviates from the manner or method in which such marketing has been approved by the FDA;

h.     An order enjoining any future marketing to vulnerable populations, including but not limited to, persons over the age of fifty-five, anyone under the age of twenty-one, and veterans;

i.     An order requiring McKinsey to publicly disclose all documents, communications, records, data, information, research, or studies related to its work with Purdue and

other manufacturers, distributors and dispensers of opioids;

j.      An order obligating McKinsey to disgorge all revenues and profits derived from its scheme;

k.      An order divesting McKinsey of any interest in and the proceeds of any work related to opioids;

l.      An award of all damages resulting from McKinsey's violation of 18 U.S.C. § 1962(c) and (d), including prejudgment interest, the sum trebled pursuant to 18 U.S.C. § 1962(c);

m.      Ordering McKinsey to compensate Plaintiff for past and future costs to abate the ongoing public nuisance caused by the opioid epidemic;

n.      Ordering McKinsey to fund an "abatement fund" for the purposes of abating the public nuisance;

o.      Awarding the damages caused by the opioid epidemic, including (a) costs for providing medical care, additional therapeutic and prescription drug purchases, and other treatments for patients suffering from opioid-related addiction or disease, including overdoses and death; (b) costs for providing treatment, counseling, and rehabilitation services; (c) costs for providing treatment of infants born with opioid-related medical conditions; (d) costs for providing care for children whose parents suffer from opioid-related disability or incapacitation; and (e) costs associated with law enforcement and public safety relating to the opioid epidemic;

p.      An award of the Plaintiff's costs, including reasonable attorney's fees, pursuant to 18 U.S.C. § 1962 (c); and

q.      Any other relief deemed just, proper, and/or equitable.

## REQUEST FOR JURY TRIAL

Plaintiff respectfully requests that all issues presented by its above Complaint be tried by a jury, except for those issues that, by law, must be tried before the Court.

DATED this 27th day of July, 2021

*Respectfully submitted:*

*Attorneys for Plaintiff Fond du Lac Band of Lake Superior Chippewa*

**ROBINS KAPLAN LLP**

By: *s/ Tara D. Sutton*
Tara D. Sutton (MN 23199X)
Holly H. Dolejsi (MN 0390110)
800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402
T: (612) 349-8500
F: (612) 339-4181
TSutton@RobinsKaplan.com
HDolejsi@RobinsKaplan.com

Timothy Q. Purdon (ND #05392)
1207 West Divided Avenue, Suite 200
Bismarck, ND 58503
T: (701) 255-3000
F: (612) 339-4181
TPurdon@RobinsKaplan.com

*To be admitted pro hac vice*
T. Roe Frazer II
FRAZER PLC
30 Burton Hills Blvd., Suite 450
Nashville, TN 37215
Telephone: (615) 647-6464
roe@frazer.law